UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THOMAS HINSON,

    Plaintiff,

v.                              Case No.: 8:18-CV-1499-VMC-AAS

UNITED STATES OF AMERICA,

    Defendant.

_____

## PLAINTIFF'S SECOND AMENDED RULE 26 (a) (2) DISCLOSURE OF EXPERT TESTIMONY

The Plaintiff, THOMAS HINSON, by and through his undersigned attorney, and pursuant to the Court's Order entered in this action on April 18, 2019 and pursuant to Rule 26 (a) (2), of the Federal Rules of Civil Procedure, makes his Second Amended Disclosure of Expert Testimony as follows:

1. The identity of the witnesses the Plaintiff may use at trial to present evidence under Federal Rules of Evidence 702, 703, or 705, are as follows:

a) MICHAEL HELDRETH, D.C., Chiropractic Physician, Total Vitality Medical Group, 24945 US Highway 19 North, Clearwater, FL 33763. Dr. Heldreth provided chiropractic care and treatment for the injuries THOMAS HINSON sustained as a result of the subject incident. Dr. Heldreth is expected to testify at trial on the following subject matters: the nature and extent of THOMAS HINSON'S injuries; the physical therapy and chiropractic care and treatment provided by him; the patient's progress; diagnosis; prognosis; his

[16-PI-1333/2283917/1]



EXHIBIT 2

referral of his patient to a specialist and the necessity therefore; the necessity and reasonableness of the care rendered and the costs of the care provided; future chiropractic care needs and daily life activity restrictions. It is anticipated that, based only upon his examination and treatment of the Plaintiff, Dr. Heldreth will opine that the care and treatment provided at Total Vitality Medical Group for those injuries was reasonable, necessary and related to the motor vehicle collision, that the expenses incurred were reasonable and necessary, and that his referral to a medical specialist was reasonable and necessary. Dr. Heldreth will testify only on his opinions formed during his treatment of the Plaintiff. Further, Dr. Heldreth will opine and his medical records will reflect that:

The Plaintiff was involved in a motor vehicle collision on November 7, 2016;

On November 9, 2016 the Plaintiff presented to Total Vitality Medical Group and had an initial visit with Dr. Heldreth. On that initial visit the Plaintiff presented with physical complaints of headaches, neck pain, mid back pain, low back pain, sacrum pain, right and left shoulder pain and right knee pain. Dr. Heldreth took note of the motor vehicle accident and what happened in it, Plaintiff's treatment history before presenting to Total Vitality Medical Group, learned of the Plaintiff's past medical and surgical history and performed a physical examination and review of symptoms. Dr. Heldreth's assessments were: cervicocranial syndrome; headache; low back pain; muscle spasms of the back; pain in the right shoulder; pain in the left shoulder; pain in the right knee; cervical radiculopathy and pain in the thoracic spine. Dr. Heldreth prescribed a treatment plan recommending conservative chiropractic manipulation, electrical stimulation, ultrasound, massage, manual therapy and a TENS unit. On that initial visit there was no chiropractic manipulation, but Dr. Heldreth prescribed a lumbar orthotic brace.

Dr. Heldreth proceeded to examine and treat the Plaintiff through February 2017. As a matter of fact, Dr. Heldreth treated the Plaintiff on the following dates in 2016: November 14, 16, 18, 28, 30, December 5, 12, 14, 19, 21, 28, and the following dates in 2017: January 4, 11, 16, 18, 20, 25, 27, February 1, 8. The treatment involved therapeutic exercises, range of motion exercises, manual therapy, electrical stimulation and hot packs.

On November 16, 2016 Dr. Heldreth prescribed that the Plaintiff undergo a Cervical Spine MRI and a Lumbar Spine MRI which were performed on November 30, 2016 at MRI Associates.

On December 14, 2016 Dr. Heldreth reviewed the Cervical Spine and Lumbar Spine reports and noted that there were disc herniations at C3-4 and C4-5 in the cervical region and disc herniations at L3-4 and L4-5 in the lumbar regions. On that date, Dr. Heldreth made a referral for his patient to orthopedic spine surgeon Frank Bono, D.O. for evaluation and treatment of the Plaintiff's neck and low back. Dr. Heldreth revised his assessments of the Plaintiff on that visit and those were: cervical disc disorder with radiculopathy, intervertebral disc disorders with radiculopathy, lumbar region, intervertebral disc disorders with radiculopathy, lumbosacral region, muscle spasm of the back, cervicocranial syndrome, headache, low back pain, pain in right shoulder, pain in the left shoulder, pain in the right knee, radiculopathy cervical region and pain in the thoracic spine.

On January 4, 2017, Dr. Heldreth performed a re-examination of his patient including an orthopedic examination and range of motion examination. On that visit, he prescribed his patient to undergo an MRI of his right knee and an MRI of his right shoulder which were

subsequently performed on January 5, 2017 at MRI Associates. On this visit Dr. Heldreth prescribed his patient a knee brace.

On January 11, 2017, Dr. Heldreth referred his patient out to orthopedic surgeon Dr. Jeff Watson for evaluation and treatment of the right knee and right shoulder.

As of the last visit to Total Vitality on February 8, 2017, the Plaintiff rated his overall pain level as 4/10 with medication and Dr. Heldreth noted that his patient's overall prognosis was guarded.

b) MOHIT BANSAL, M.D., Comprehensive Spine Institute, 1988 Gulf to Bay Boulevard, Clearwater, FL 33765. Dr. Bansal is an orthopedic surgeon who provided medical care, evaluation and treatment for the injuries THOMAS HINSON sustained as a result of the subject incident, including the performance of a shoulder surgery on February 10, 2017. Dr. Bansal is expected to testify at trial on the following subject matters: the nature and extent of THOMAS HINSON'S injuries; the nature and extent of any aggravation of a pre-existing medical condition; the causation of those injuries and aggravations by the subject incident; the permanency of those injuries and aggravations; diagnosis; differential diagnosis; prognosis; the specific medical and surgical care and treatment provided by him and the necessity of same; medical and surgical care and treatment to be rendered in the future; the necessity and reasonableness of the care rendered and the costs of the care provided; future care needs; daily life activity restrictions; anticipated effects of the injuries into the future; and disabling effects of the injuries on the patient's personal life as well as occupational life, including reasonable restrictions on work activities, as well as his interpretation of the diagnostic studies performed on the Plaintiff. It is anticipated that, based only upon his examination and treatment of the Plaintiff, Dr.

[16-PI-1333/2283917/1]

Bansal will opine that: THOMAS HINSON suffered personal injuries to his right shoulder and right knee as a direct result of the subject incident; suffered aggravation of pre-existing medical arthritic condition of his right knee as a direct result of the subject incident; that those injuries to his shoulder and knee are permanent injuries to a reasonable degree of medical probability; that the care and treatment he received by Dr. Bansal for those injuries and aggravations were reasonable, necessary and related to the injuries sustained in the motor vehicle collision; that the bills incurred for Dr. Bansal's care and treatment were reasonable and necessary expenses; that he will need future medical care and treatment for his injuries at certain costs to a reasonable degree of medical certainty; that his injuries have in the past, and will in the future, cause him pain and discomfort which will adversely impact his daily life activities; and his ability to work at his chosen occupation, and that his injuries have caused him certain disabilities and impairments.  Dr. Bansal will testify only on his opinions formed during his treatment of the Plaintiff.  Further, Dr. Bansal will opine, and his medical records reflect, that:

The Plaintiff was involved in a motor vehicle collision on November 7, 2016;

On 1/24/2017 the Plaintiff presented to Comprehensive Spine Institute for an initial visit with Dr. Bansal with a chief complaint of right shoulder pain and right knee pain;

On that initial visit Dr. Bansal performed a review of systems, history and physical examination and evaluation and reviewed a right shoulder MRI performed at Palm Harbor MRI on 1/5/2017 and a right knee MRI performed at Palm Harbor MRI on 1/5/2017;

Dr. Bansal personally reviewed the right shoulder MRI which revealed to him a rotator cuff tear as well as biceps tendonitis and the MRI of the right knee revealed to him significant arthritic changes with an extruded meniscus and a previous meniscectomy with medial and lateral tibia plateau edema;

Dr. Bansal's assessment on that date was right shoulder rotator cuff tear and biceps tendinopathy and right knee meniscal tear and osteoarthritis;

On the initial visit shoulder surgery was discussed with the patient;

On the initial visit Dr. Bansal felt that his patient's right shoulder injury was directly related to his traumatic motor vehicle accident, and that the patient's right knee pain was likely an exacerbation of severe osteoarthritis;

On 2/6/2017 Dr. Bansal dispensed a shoulder immobilizer to his patient for the upcoming right shoulder surgery;

On 2/10/2017 Dr. Bansal performed the following procedures on the Plaintiff at Comprehensive Surgery Center;

Right shoulder arthroscopy, arthroscopic biceps tenotony, arthroscopic medium rotator cuff repair, and subacromial decompression, his post-operative diagnosis was the same as his preoperative diagnosis, that being right shoulder rotator cuff tear and long head of the biceps tendonitis and impingement syndrome;

On 2/23/2017, Dr. Bansal evaluated the Plaintiff who was two weeks post right shoulder surgery, and started the Plaintiff on type III rehabilitation and noted that the patient cannot drive at this time.  The Plaintiff continued with physical therapy visits with the last physical therapy session (#17) on June 6, 2017, at which time he was discharged;

Dr. Bansal examined and evaluated the Plaintiff on June 8, 2017 and noted that his patient was progressing very well so he continued the Plaintiff on home exercises for strengthening.

c) JED WEBER, M.D., Comprehensive Spine Institute, 1988 Gulf to Bay Boulevard, Clearwater, FL 33765. Dr. Weber is a neurosurgeon who provided medical care, evaluation and treatment for the spine injuries THOMAS HINSON sustained as a result of the subject incident, including the performance of a spinal injection. Dr. Weber is expected to testify at trial on the following subject matters: the nature and extent of THOMAS HINSON'S spinal injuries; the nature and extent of any aggravation of a pre-existing medical condition; the causation of those injuries and aggravations by the subject incident; the permanency of those injuries and aggravations; diagnosis; differential diagnosis; prognosis; the specific medical and surgical care and treatment provided by him and the necessity of same; medical and surgical care and treatment to be rendered in the future; the necessity and reasonableness of the care rendered and the costs of the care provided; future care needs; daily life activity restrictions; anticipated effects of the injuries into the future; and disabling effects of the injuries on the patient's personal life as well as occupational life, including reasonable restrictions on work activities, as well as his interpretation of the diagnostic studies performed on the Plaintiff. It is anticipated that, based only upon his examination and treatment of the Plaintiff, Dr. Weber will opine that: THOMAS HINSON suffered personal injuries to his cervical spine and lumbar spine as a direct result of the subject incident, including but not limited to cervical myelopathy and is at risk for a devastating neurologic injury; that those injuries to his cervical and lumbar spine are permanent injuries to a reasonable degree of medical

probability; that the care and treatment he received by Dr. Weber for those injuries were reasonable, necessary and related to the spinal injuries sustained in the motor vehicle collision; that the bills incurred for Dr. Weber's treatment were reasonable and necessary expenses; he will need future medical care and treatment for his injuries at certain costs to a reasonable degree of medical certainty; that his injuries have in the past, and will in the future, cause him pain and discomfort which will adversely impact his daily life activities; and his ability to work at his chosen occupation, and that his injuries have caused him certain disabilities and impairments. Dr. Weber will testify only on his opinions formed during his treatment of the Plaintiff. Further, based only upon his medical records and the examination and treatment of the Plaintiff, Dr. Weber will opine that:

The Plaintiff was involved in a motor vehicle collision on November 7, 2016;

The Plaintiff presented to Comprehensive Spine for an initial visit with Dr. Weber on 1/24/2017 with a chief complaint of neck pain with balance problems as well as low back pain with associated right lower extremity pain. On that initial visit Dr. Weber performed a review of systems, history and physical examination and evaluation, and reviewed a cervical spine MRI performed at Palm Harbor MRI on 11/30/2016 and a lumbar spine MRI performed at Palm Harbor MRI on 11/30/2016;

Dr. Weber personally reviewed the cervical spine MRI which revealed to him the following: mild cervical kyphosis, at C2-3 there is degenerative disc disease that is mild. At C3-4 there is a disc protrusion that is small, spinal cord deformity that is mild and foraminal stenosis bilaterally that is severe. Degenerative disc disease is mild. At C4-5 there is a disc protrusion that is small to moderate in size resulting in spinal cord

compression and deformity that is moderate and high signal within the cord. Degenerative disc disease is moderate. At C5-6 there is a disc protrusion that is small, foraminal stenosis on the right that is severe and mild on the left. At C6-7 there is foraminal stenosis on the left that is mild. Dr. Weber personally reviewed the lumbar spine MRI which revealed to him the following: demonstrates at L1- to a normal disc. At L2-3 there is degenerative disc disease that is mild. At L3-4 there is a herniated disc that is small and eccentric to the left with lateral recess stenosis on the left that is severe. At L4-5 there is a herniated disc which is small broad-based, facet hypertrophy which is moderate, lateral recess stenosis bilaterally that is severe and degenerative disc disease is moderate. At L5-S1 there is a disc protrusion that is small and lateral recess stenosis that is moderate to severe. Degenerative disc disease is moderate;

On the initial visit, Dr. Weber's impression and diagnosis for the Plaintiff's cervical spinal region is as follows: Cervical – patient has evidence of an early cervical myelopathy. MRI demonstrates spinal cord compression, deformity and high signal in the spinal cord at C4-5. There is spinal cord compression and deformity at C3-4. This patient is at risk for a devastating neurologic injury. Lumbar – Patient has evidence of a lumbar radiculopathy. MRI demonstrates a disc herniation at L4-5;

Dr. Weber recommended to the Plaintiff that he undergo an interior cervical decompression, instrumentation and fusion with plating at C3-4 and C4-5. Dr. Weber also recommended a lumbar transforaminal epidural steroid injection to the L4-5 spinal region;

On 2/6/2017 Dr. Weber performed on the Plaintiff at Comprehensive Surgery Center a right L4-5 transforaminal epidural steroid injection through fluoroscopic guidance;

On 2/15/2017 Dr. Weber's records reported that his patient received relief from the lumbar injection, but that the Plaintiff has evidence of cervical myelopathy and that there was a discussion for proceeding with a cervical decompression, instrumentation and fusion.

d) CHARLES DOMSON, M.D. of Palm Harbor MRI, 32615 US Highway 19 N, Suite 4, Palm Harbor, FL 34684. Dr. Domson was the reading radiologist for the following diagnostic studies: MRI Lumbar Spine, dated November 30, 2016 and MRI Cervical Spine dated November 30, 2016. This radiologist is expected to testify at trial on the following subject matters: his respective review and interpretations of the diagnostic studies mentioned above and what is revealed by those studies, including abnormalities. Dr. Domson will opine, and his written report of his findings of the Cervical MRI reflect as follows that:

1. Straightening of the cervical lordosis was noted.
2. There was an area of slight increased T2 signal in the cord at the C4-5 disc level.
3. Dessicated, bulging disc and 4MM broad-based disc protrusion and osteophyte at C4-5 with severe canal stenosis and mild cord compression with mild increased T2 signal throughout the cord and severe foraminal narrowing is seen right greater than left.
4. 4MM broad based posterior disc protrusion at C3-4 with moderate canal stenosis and moderate foraminal narrowing bilaterally.
5. Dessicated, bulging disc and osteophyte and uncovertebral joint hypertrophy at C5-6 with moderate canal stenosis and moderate foraminal narrowing bilaterally.
6. Dessicated, bulging disc with uncovertebral joint and facet hypertrophy on the left at C6-7 with severe foraminal narrowing on the left.

Dr. Domson will opine, and his written report of his findings of the Lumbar MRI reflect as follows that:

1. Dessicated, bulging disc and bilateral facet hypertrophy at L5-S1 with foraminal narrowing on the right.

2. Bulging disc and 4MM broad-based disc protrusion toward the right at L4-5 with osteophyte and facet hypertrophy, with mild foraminal narrowing right greater than left with mild canal stenosis.

3. 6MM left paracentral disc protrusion at L3-4 with moderate lateral recess narrowing on the left.

4. Mild bulging disc and facet hypertrophy at L2-3 with mild foraminal narrowing right greater than left.

It is anticipated that: based solely upon his personal review of the Lumbar and Cervical MRI studies, Dr. Domson will opine that the Lumbar MRI and Cervical MRI mentioned above revealed the above stated anatomical findings.

e) JOSE M. NEGRON-SOTO, M.D. of Palm Harbor MRI, 32615 US Highway 19 N, Suite 4, Palm Harbor, FL 34684. Dr. Negron-Soto was the reading radiologist for the following diagnostic studies: MRI of Right Knee dated January 5, 2017 and MRI of Right Shoulder dated January 5, 2017. This radiologist is expected to testify at trial on the following subject matters: his respective review and interpretations of the diagnostic studies mentioned above and what is revealed by those studies, including abnormalities. Dr. Negron-Soto will opine, and his written report of his findings of the Right Knee MRI reflect as follows:

1. That the findings are consistent with sequela of advanced degenerative joint disease changes, including high-grade chondromalacia in the medial compartment with a degenerative tear of the medial meniscus.

2. At the lateral compartment there is moderate to high grade condromalacia associated with meniscal degeneration and pseudoextrusion at the level of the body segment where grade 3 signal abnormality is noted consistent with degenerative tear that extends towards anterior horn body junction. There is bone marrow edema at the posterolateral tibial condyle consistent with stress phenomenon, compounded with a small focus of osteonecrosis measuring approximately 5x2MM maximum dimensions.

3. Patellofemoral compartment condromalacia.

4. Small joint effusion and synovitis.

5. Soft tissue edema seen medially at the coronary recess and superficial and deep to the superficial fibers of the MCL.

6. Trace fluid in the gastrocnemius and semimembranosus bursa consistent with an early developing Baker cyst.

Dr. Negron-Soto will opine, and his written report of his findings of the Right Shoulder MRI reflect as follows:

1. Evidence of full thickness retracted supraspinatus tendon tear. There is mild volume loss of the supraspinatus muscle belly. There is severe acromioclavicular joint arthropathy. Trace glenohumeral joint effusion and synovitis is seen. There is subacromial/subdeltoid bursal effusion present.

2. Long head of the biceps tenosynovitis, inflammatory changes at the rotator interval consistent with adhesive capsulitis noted.

3. Supraspinatus tendon is torn and retracted medially to the level of the acromion with a fluid filled gap measuring approximately 3cm transverse by 2-3cm AP.

It is anticipated that: based solely upon his personal review of the Right Knee and Right Shoulder MRI studies, Dr. Negron-Soto will opine that the Right Knee MRI and Right Shoulder MRI mentioned above revealed the above stated anatomical findings.

f) MICHAEL J. FOLEY, M.D., F.A.C.R, Radiographic Consultants, LLC, 101 East Kennedy Blvd., Suite 3900, Tampa, Florida 33602. Dr. Foley is a radiologist who read and interpreted the following diagnostic studies; MRI Lumbar Spine, dated November 30, 2016 and MRI Cervical Spine dated November 30, 2016 and MRI of Right Knee dated January 5, 2017 and MRI of Right Shoulder dated January 5, 2017. Dr. Foley is a witness who has been retained by Plaintiff's counsel to provide expert testimony in this case. Accordingly, he has prepared and signed a written report which is attached hereto. That report and its attachments contain the information set out in Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

2. The physicians identified in subparagraphs a-e of Paragraph 1 above are treating physicians and healthcare providers of THOMAS HINSON. They have not been retained or specially employed to provide expert testimony in this case. Therefore, under Rule 26 (a)(2)(B) of the Federal Rules of Civil Procedure, this disclosure of those treating physicians need not be accompanied by a written report.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via electronic mail to: **Carolyn Tapie,** Assistant United State Attorney, 400 North Tampa Street, Suite 3200, Tampa, Florida 33602, Carolyn.B.Tapie@usdoj.gov, this 25th day of April, 2019.

/s/ *Stephen H. Haskins*
**STEPHEN H. HASKINS, ESQUIRE**
FBN: 0299790
*LUCAS| MAGAZINE*
8606 Government Drive
New Port Richey, FL 34654
Ph. (727) 849-5353; Fax (727) 845-7949
Primary Email: lucasmagazine@lucasmagazine.com



## Radiographic Consultants, LLC

101 East Kennedy Boulevard, Suite 3900
Tampa, Florida 33602
Tel: (813) 229-1208
Fax: (813) 229-1209

January 4, 2019

James L. Magazine, Esquire
Law Office of Lucas Magazine
Liberty Professional Center
8606 Government Drive
New Port Richey, Florida 34654

| | |
|---|---|
| Re: | **Thomas Hinson, Jr. – Rule 26 Report from Michael J. Foley, M.D., F.A.C.R.** |
| D/A: | **11/07/2016** |
| DOB: | **03/28/1952** |

Dear Mr. Magazine,

At your request and in compliance with Federal Rule of Civil Procedure 26, I am writing this summary of my opinions in the above-referenced matter. My opinions are based on a reasonable degree of medical certainty and founded on my professional education, training and experience and will also be based on the images and records that I reviewed. I reserve the right to amend or supplement these opinions should additional information become available.

### QUALIFICATIONS

I have been licensed to practice medicine in the State of Florida since 1983. I graduated from Northwestern University School of Medicine and received an M.D. degree from Northwestern in 1978. I did a medical internship at the University of California, San Diego, from 1978 to 1979. I did my radiology residency at Northwestern University from 1979 through 1983. I was elected Chief Resident of Radiology in my senior year at Northwestern University School of Medicine. I became Board Certified in Diagnostic Radiology in 1982. I did a Fellowship in Nuclear Medicine, CT and Ultrasound, at Northwestern University School of Medicine, which is an additional year of training, in 1982-1983. I then took an additional Board in Nuclear Medicine in 1983 and became Board Certified in Nuclear Radiology and subsequently later took an additional Board in Interventional Radiology in 1996 and that Board was in effect from 1996 until 2006. Interventional Radiology is a specialty where the radiologist performs procedures on patients such as angiograms, angioplasties, and pain management procedures. As part of my Diagnostic Radiology Residency and Fellowship I underwent training in the field of Musculoskeletal Radiology and Trauma Radiology. I have taught in the field of Radiology, first at Northwestern University Medical School as a Chief Resident and Fellow and later at the University of South Florida School of Medicine, where I ran a Radiology Residency Board Review program. I have committed much of my professional life to working as a clinical radiologist. Over my professional career, I have had privileges at Brandon Regional Hospital, University Community Hospital, University Community Hospital at